UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                 Plaintiff,

v.
                                     09-CV-0849

ERIE COUNTY, NEW YORK;
CHRIS COLLINS, COUNTY EXECUTIVE;
ANTHONY BILLITTIER, IV, MD, COUNTY
HEALTH COMMISSIONER;
TIMOTHY B. HOWARD, ERIE COUNTY
SHERIFF; RICHARD T. DONOVAN,
ERIE COUNTY UNDERSHERIFF;
ROBERT KOCH, SUPERINTENDENT,
ADMINISTRATIVE SERVICES DIVISION,
JAIL MANAGEMENT DIVISION;
BARBARA LEARY, FIRST DEPUTY
SUPERINTENDENT FOR ERIE COUNTY
HOLDING CENTER; DONALD LIVINGSTON,
FIRST DEPUTY SUPERINTENDENT FOR
ERIE COUNTY CORRECTIONAL FACILITY,

                 Defendants.
_____

## STIPULATED SETTLEMENT AGREEMENT AND ORDER CONCERNING SUICIDE PREVENTION AND RELATED MENTAL HEALTH ISSUES

## I.     INTRODUCTION

A.    The plaintiff in this action is the United States of America ("United States").

B.    The Defendants in this action are the Erie County, New York ("the County"); Chris Collins, County Executive; Anthony Billittier, IV, MD, County Health Commissioner; Timothy B. Howard, Erie County Sheriff; Richard T. Donovan, Erie County Undersheriff; Robert Koch, Superintendent Administrative Services Division, Jail Management Division; Barbara Leary, First Deputy Superintendent for Erie County Holding Center; and Donald

Livingston, First Deputy Superintendent for Erie County Correctional Facility (collectively, "Defendants" or "the County").

C. On November 13, 2007, the United States Department of Justice notified the County of its intention to investigate conditions of confinement at the Erie County Holding Center ("ECHC") and the Erie County Correctional Facility ("ECCF") (collectively, the "Facilities), pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997.

D. On July 15, 2009, the United States issued a findings letter pursuant to 42 U.S.C. § 1997 alleging that certain conditions at ECHC and ECCF violate the constitutional rights of individuals confined in those facilities.

E. On September 30, 2009, the United States filed a complaint pursuant to 42 U.S.C. § 1997 alleging deprivation of rights, privileges, or immunities secured and protected by the Constitution of the United States.

F. The Parties enter into this Stipulated Settlement and Order ("Stipulated Settlement") and desire to compromise, settle, satisfy and resolve fully and finally all differences or disputes between them in connection with suicide prevention and related mental health issues and to avoid the further expense, disruption and uncertainty of litigation, without admitting any liability, on the terms and conditions set forth in this document, and consistent with the mediation between the parties. This Stipulated Settlement settles only the limited issues of suicide prevention and related mental health treatment. All other claims in the complaint filed by the United States remain on the Court's active docket and are in litigation.

G. The County asserts that it is currently implementing certain provisions of the Stipulated Settlement. The United States asserts that the County's implementation is subject to review by the Joint Compliance Officer.

H. The Defendants agree that this Stipulated Settlement complies in all respects with the requirements for prospective relief under the Prison Litigation Reform Act, 18 USC § 3626 (a).

I. The Parties stipulate and agree that all of the prospective relief in this Stipulated Settlement is narrowly drawn and extends no further than necessary to correct the violation of the federal right. The Defendants do not agree or admit that the Eighth or Fourteenth Amendments require any of the specific remedies in this Stipulated Settlement.

J.    The issue of liability has not been litigated.  The Parties ask the Court to approve this Stipulated Settlement without a full hearing on the merits, on the basis of the above stipulations.

K.    By entering into this Stipulated Settlement the Defendants do not waive the right to contest the Findings Letter and any of the conclusions therein.

L.    The County and the Defendants agree to implement all requirements under this Stipulated Settlement. The implementation of this Stipulated Settlement will begin immediately upon the effective date.

M.    This Stipulated Settlement may not be used as evidence of liability in any other legal proceeding.  The issue of liability with respect to suicide prevention and related mental health treatment has not been litigated.

N.    No person or entity is intended to be a third-party beneficiary of the provisions of this Stipulated Settlement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Stipulated Settlement.  This Stipulated Settlement is not intended to impair or expand the right of any person or organization to seek relief against the County or their officials, employees, or agents for their conduct.  This Stipulated Settlement does not alter legal standards governing any such claims, including those standards established by New York State law.

## II.    DEFINITIONS

A.    "DOJ" shall refer to the United States Department of Justice, which represents the United States in this matter.

B.    "Effective date" shall be the date the Order is entered by the Court.

C.    "Generally accepted correctional standards of care" shall mean a decision by a qualified professional that is substantially aligned with contemporary, accepted professional judgment, practice, or standards and demonstrates that the person responsible based the decision on such accepted professional judgment.

D.    "Timely" shall mean the provision of medical or mental health care consistent with generally accepted correctional standards of care, depending on the nature of the situation, such as emergency, urgent, or routine.

E.    "Include" or "including" shall mean "include, but not be limited to" or "including, but not limited to."

F.  "ECHC" and "ECCF" or "the facilities" or "the jail" shall refer to the Erie County Holding Center, the Erie County Correctional Facility, or the facilities jointly, as well as any facility that is built, leased, or otherwise used, to replace or supplement either or both facilities.

G.  "Inmate" or "inmates" shall be construed broadly to refer to one or more individuals detained at, or otherwise housed, held, in the custody of, or confined at ECHC and/or ECCF.

H.  "Corrections staff" means all ECCF/ECHC employees and contractors, irrespective of job title, whose regular duties include the supervision of inmates at ECHC and/or ECCF.

I.  "Quality Improvement" means a multidisciplinary quality improvement committee that meets as required, but no less than quarterly, designs quality improvement monitoring activities, discusses the results, and implements corrective action relative to suicide prevention and related mental health care.

J.  "Suicide Precautions" means any level of watch, observation, or measures to prevent self-harm, including where an inmate self-reports suicidal ideations or suicide risk or is identified by a corrections staff, qualified health professional or qualified mental health professional.

K.  "Train" means to instruct in the skills addressed to a level that the trainee has the demonstrated proficiency to implement those skills.  "Trained" means to have achieved such proficiency.

L.  "Qualified health professional" means a physician, physician assistant, nurse practitioner, a registered nurse, or a practical nurse who is currently licensed by the State of New York and provides medical care and services to inmates at ECHC and/or ECCF.

M.  "Qualified mental health professional" means an individual with a minimum of masters-level education and training in psychiatry, psychology, counseling, social work or psychiatric nursing, who is currently licensed by the State of New York to evaluate and care for the mental health needs of inmates at ECHC and/or ECCF.

N.  "Joint Compliance Officer," ("JCO") means the individual jointly selected to oversee and evaluate the County's implementation of and compliance with this Stipulated Settlement.

O.    Throughout this Stipulated Settlement, the following terms are used when discussing compliance:  substantial compliance, partial compliance, and non-compliance.  "Substantial compliance" indicates that the facilities have achieved compliance with most components of the relevant provision of the Stipulated Settlement.  "Partial compliance" indicates that compliance has been achieved on some of the components of the relevant provision of the Order, but significant work remains.  "Non-compliance" indicates that most or all of the components of the Stipulated Settlement provision have not yet been met.  Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain substantial compliance.  At the same time, temporary compliance during a period of sustained noncompliance shall not constitute substantial compliance.

## III.    SUBSTANTIVE PROVISIONS

### A.    Jail Suicide Prevention Program

The County agrees that inmates will be protected from conditions that place inmates at significant risk of harm from suicide or self-injurious behavior.   To meet this requirement, the County agrees to take the following specific steps:

####     1.    Screening and Assessment

a.    The County is utilizing corrections staff and/or a registered nurse to conduct suicide screenings and health screenings upon admission to the ECHC to identify the inmate's risk for suicide or self-injurious behavior.  The County agrees to implement its program to utilize a registered nurse to administer suicide and/or health screenings for inmates admitted to ECHC. In the event that a registered nurse is not available to conduct the initial screen due to staff shortages, unforeseen absences by employees, lack of coverage, or emergency, Corrections Staff may be utilized to conduct the initial screen.  The suicide screen will be conducted upon admission to ECHC and upon re-entry of inmates to ECHC after sentencing. The County agrees to continue utilizing the New York State Commission of Corrections ("COC") screening form, as modified, to include the following screening factors:

  i.     past suicidal ideation and/or attempts;
  ii.    current suicidal ideation, threat, or plan;
  iii.   prior mental health treatment or hospitalization;

   iv.  recent significant loss such as the death of a family member or close friend;

   v.  history of suicidal behavior by family members and/or close friends;

   vi.  suicide risk during any prior confinement;

   vii.  any observations of the transporting officer, court, transferring agency, or similar individuals regarding the inmate's potential suicidal risk;

   viii.  substance/s or medications used;

   ix.  amount;

   x.  time of last use;

   xi.  history of use;

   xii.  any physical observation, such as shaking, seizing, hallucinating;

   xiii.  history of drug withdrawal symptoms, such as agitation, tremors, seizures, hallucinations, and D.T. (delirium tremens).

b. The County agrees to identify inmates who are potentially suicidal and suicidal. The County agrees to place all potentially suicidal and suicidal inmates onto constant observation, and a qualified mental health professional will perform a timely mental health assessment, based on the inmate's classification, within 48 hours or sooner, as medically necessary.

c. Mental health assessments triggered by a screening shall include, at a minimum, the following assessment factors:

   i.  the suicide risk screening indicates that the inmate is suicidal or potentially suicidal;

   ii.  any suicide attempt in the past;

   iii.  any suicidal ideations, with intent/plan within the past 30 days,

   iv.  any command hallucinations to harm self within the last 30 days;

   v.  any combination of the following:

     a) suicidal ideations within the past year with or without intent/plan,

     b) suicidal gestures (current and/or within past year),

     c) one or more of the following diagnoses: bipolar disorder, depressed, major depression with or without psychotic features, schizophrenia, schizoaffective disorder, any diagnosis within the

pervasive developmental disorder spectrum, and any other factor(s) determined by the interdisciplinary team (IDT) as contributing to suicide risk (e.g. recent loss, family history of suicide, etc.);  and

vi.    any history of self injurious behavior resulting in injury requiring medical attention within the past year.

All assessments shall be completed by a qualified mental health professional, pursuant to generally accepted correctional standards of care.

d.  The County agrees to have a qualified mental health professional perform a mental health assessment following any of these triggering events: suicide attempt, any suicidal ideation, with or without a plan, or any aggression to self resulting in major injury. Additionally, the County agrees to have a health assessment by a qualified health professional performed following any of these triggering events:  any incident of an individual testing positive for illicit substance (street drug) use, use of benzodiazepines (continuous for more than 60 days) in an individual with a past history of substance use disorder, suicide attempt, any suicidal ideation, with or without a plan, or any aggression to self resulting in major injury.

e.  The County agrees to provide inmates with reasonable privacy in medical and mental health care, including screenings and assessments, and maintain the confidentiality of inmates' medical and mental health status, subject to legitimate security concerns and emergency situations.  Screenings will continue to occur at the booking windows with a reasonable expectation of privacy.

f.  The County agrees that the nursing staff will complete assessments of inmates in acute detoxification every eight hours with observations and vital signs, not limited to blood pressure.

g.  The County agrees that all inmates discharged from suicide precautions receive a follow-up assessment in accordance with a treatment plan developed by a qualified mental health professional.

## 2. Suicide Prevention Training Program

a.  By November 1, 2010, the County will review and revise its suicide prevention training program, as necessary to effectuate this Stipulated Settlement.

b. An initial eight-hour suicide prevention training will be completed by all corrections staff. The suicide prevention training program and curriculum will include the following topics if not already included in other annual training: i. suicide prevention policy (as revised consistent with this Stipulated Settlement); ii. analysis of facility environments and why they may contribute to suicidal behavior; iii. potential predisposing factors to suicide; iv. high risk suicide periods; v. warning signs and symptoms of suicidal behavior; vi. relevant case studies of suicides and serious suicide attempts; vii. mock emergency response drill related to a suicide attempt; and viii. the proper use of emergency equipment.

c. The suicide prevention training program will train corrections staff on the suicide risk assessment tool and the medical intake tool.

d. The suicide prevention training program will train corrections staff in observing inmates on suicide watch and step-down unit status.

e. The County agrees that all corrections staff will be certified in cardiopulmonary resuscitation.

f. The County will provide a first aid kit, including a CPR mask, accessible to all housing units, and will continue to maintain emergency rescue tools on corrections staff assigned to housing units.

g. The County will document Suicide Prevention Training of corrections staff, qualified health professionals, and qualified mental health professionals.

## 3. Detoxification Training Program

a. The County agrees to implement a detoxification training program. The detoxification training program will include the following:

   i. Qualified mental health professionals will be trained annually on alcohol withdrawal and withdrawal from other substances, including benzodiazepines.

   ii. The chief medical officer and his or her delegate will train qualified health professional staff annually on alcohol withdrawal and withdrawal from other substances, including benzodiazepines. Also, qualified health professionals will be trained on the use and treatment of benzodiazepines.

b. The detoxification training program will include an initial training of corrections staff by qualified health professionals and qualified mental health professionals on the policies and practices of the detoxification unit and on suicide assessment, suicide prevention, and drug and alcohol withdrawal. The detoxification training program will include annual training for corrections staff on the policies and procedures of the detoxification unit.

c. The detoxification training program will include that qualified mental health professionals be trained in providing inmates with timely referral to a qualified psychologist or psychiatrist, as appropriate.

d. The detoxification training program will include cardiopulmonary resuscitation training, if not included in other annual training.

e. The detoxification training program will include training for corrections staff on how to recognize medical emergencies, how to conduct cardiopulmonary resuscitation, and how to use first aid equipment, including the cardiopulmonary resuscitation mask, if not included in other annual training.

f. The detoxification training program will include training for qualified health professionals on proper medication administration practices, including appropriately labeling containers and contemporaneously recording medication administration.

h. The County will document detoxification training of corrections staff, qualified health professionals, and qualified mental health professionals.

**4. Annual Refresher Training**

The County agrees that it will provide two hours of refresher training including the topics of suicide prevention and detoxification on an annual basis. Said training of corrections staff, qualified health professionals, and qualified mental health professionals will be documented by the County.

**5. Communication and Records System**

a. The County agrees that corrections staff, qualified health professionals and qualified mental health professionals, as applicable, will continue to document the initiation of suicide

precautions including level of observation, housing location, and conditions of the precautions.

b. By March 1, 2011, the County agrees that medical and mental health records will be merged into one uniform record or file to improve coordination and continuity of care.

c. The County agrees to maintain, for each inmate confidential and organized records of all medical and/or mental health screening, assessments, and/or treatments received within the ECHC or ECCF. Such records shall include, where practicable, information regarding symptoms, the results of physical evaluations, and medical and mental health staff progress notes so that qualified health professionals and qualified mental health professionals will have such information available when treating inmates.

d. The County will maintain complete information and medical documentation on each inmate.

e. The County agrees that administrative segregation and observation status are used solely for the safety and security of the inmate.

## 6. Housing

a. The County represents that it has already awarded the contract to place suicide-resistant plexiglass over the bars in the podular units in ECHC using suicide-resistant bolts and/or brackets, so there are no protrusions, and agrees to complete the performance of such work by September 1, 2010.

b. The County represents that it has already awarded the contract to replace the existing air ventilation grates in the podular units in ECHC with grates having holes that are 1/8" to 3/16" wide (16-mesh per square inch), so there are no protrusions, and agrees to complete the performance of such work by December 1, 2010.

c. The County agrees to modify all bunk holes to be made suicide-resistant in all podular units in ECHC by June 1, 2011.

d. The County agrees that a qualified mental health professional or a qualified health professional will set forth the conditions of the observation, including but not limited to, allowable clothing, property, and utensils, and orders addressing continuation of privileges, such as showers, telephone, visiting, recreation, etc., commensurate with the inmate's security level. The conditions of

observation will be for safety and security only and shall allow an inmate with suicide precautions similar access to property and recreation as the general population, unless a qualified mental health professional deems such access would contribute to self-injurious behavior.

e.  The County will avoid the use of any "smock" or restraints (e.g. leg irons, handcuffs, or chair), whenever possible, and use only as a last resort when the inmate is engaging in self-injurious behavior.  A qualified mental health professional or, in his or her absence, a qualified health professional, will decide when these options may be used.

**B.      Risk Management Program**

The Defendants will formalize a risk management program to protect inmates from conditions that place inmates at significant risk of harm from suicide or self-injurious behavior and to review the efficacy of Defendants' suicide prevention program.

1.  The Risk Management Program will include, but not be limited to, the following processes:  incident reporting, data collection, and data aggregation to capture sufficient information to formulate a reliable risk assessment at the individual and system levels; identification of at-risk inmates in need of clinical or interdisciplinary review or treatment; identification of situations involving at-risk inmates that require review by an interdisciplinary team and/or systemic review by administrative and professional committees;  a hierarchy of interventions that corresponds to levels of risk;  mechanisms to notify interdisciplinary teams and the risk management system of the efficacy of interventions;  identification and analysis of trends in high risk situations, utilizing triggers as set forth in Appendix A.

2.  The Risk Management Program shall set forth the criteria and categories in the screening and assessment factors, as included in III (A)(1)(a) and triggers and thresholds as included in Appendix A to assess inmates' risk of harm.  The JCO may modify the criteria and categories set forth herein, if the modification is agreed to by the Parties.

3.  The Risk Management Program will include the following hierarchy of interventions:  first level – screening; second level– interdisciplinary team which develops a treatment plan; third level– quality improvement program; and mortality/morbidity committee.

a. First Level– Screening:  Screening of inmates will be conducted in accordance with section III(A)(1)(a) of this Stipulated Settlement.

b. Second Level – Interdisciplinary Team:  The interdisciplinary team will include qualified health professionals and qualified mental health professionals.  The interdisciplinary team will review all individuals assessed in accordance with section III(A)(1)(c).  The County agrees that qualified mental health professionals will assess for risk of suicide or self injurious behavior based on the level of risk identified in the screening at section III (A)(1)(a).   The County will continue to develop and implement timely treatment plans that adequately address inmates' serious mental health needs and that contain interventions specifically tailored to the inmates' diagnoses.  The County agrees to timely refer and treat inmates for specialty care and to provide regularly scheduled visits with qualified mental health professionals, crisis services, and/or provide in-patient psychiatric care where assessments reveal serious mental illness and/or suicidal ideation when clinically appropriate.

c. Third Level – the Quality Improvement Program- The Defendants will develop and implement a written quality improvement program to identify deficiencies in inmate suicide prevention, detoxification, and related mental health care, and to regularly assess and ensure compliance with the terms of this Stipulated Settlement.

   i. The quality improvement program will be led by a multidisciplinary team that meets regularly, but no less than quarterly, to review data elements reflective of practice standards established pursuant to policies and procedures.  Each workgroup within the program will also meet regularly, but no less than quarterly.

   ii. As part of the quality improvement program, the suicide prevention workgroup will include, but is not limited to, the Chief Medical Officer or designee, Director of Correctional Health, Director of Intensive Mental Health Services, Senior Psychiatric Consultant and representative(s) from the Jail Management Division.  The suicide prevention workgroup will:

-12-

       1. develop and implement a written quality improvement plan to identify deficiencies in inmate suicide prevention, detoxification, and mental health care, and

       2. regularly assess and ensure compliance with the terms of this Stipulated Settlement.

iii. The program will do the following:

       1. monitor the risk management activities of the ECHC and ECCF;

       2. review and analyze aggregate risk management data;

       3. identify individual and systemic risk management trends;

       4. make recommendations for further investigation of identified trends and for corrective action, including system changes; and

       5. monitor implementation of recommendations and corrective actions.

iv. As part of the quality improvement program, there will also be a detox workgroup and mental health care workgroup. Each of the identified workgroups will:

       1. assess current processes;

       2. identify barriers and deficiencies;

       3. develop ways to address, identify and collect the critical data elements;

       4. review the data and outcomes;

       5. formalize standards of practice;

       6. make policy and practice recommendations based upon the outcomes; and

       7. develop procedures to implement review of data into regular supervision/management, as relevant to the specified work group.

v. The quality improvement program will review cases of individuals, who meet the thresholds in Appendix A, to identify patterns or trends.

vi. The quality improvement program related to suicide prevention will include the annual performance assessment, as related to suicide prevention and related

-13-

mental health care, of: screening during booking for suicide risks; inmate assessments and dispositions by qualified health professionals; timely and clinically appropriate access to medical and mental health care by inmates; and the evaluation and treatment of inmates for withdrawal by qualified health professionals.

vii. For individuals reviewed for detoxification, the quality improvement program will provide recommendations to the interdisciplinary team; require that medical assessments are performed and medical and nursing interventions are developed and implemented, where indicated; and analyze individual in aggregate medical data and identify trends that present a risk of harm.

4. The Morbidity/Mortality Committee

a. The morbidity and mortality review committee shall include, at a minimum, the Superintendent or designee, Chief Medical Officer, Director of Intensive Adult Services, Director of Correctional Health and qualified medical professionals and qualified mental health professionals.

b. The morbidity and mortality review committee shall conduct written interdisciplinary reviews of all suicides and serious suicide attempts (e.g., those incidents requiring hospitalization for medical treatment).

c. Reviews by the morbidity and mortality review committee will examine:

i. circumstances surrounding the incident;
ii. facility procedures relevant to the incident;
iii. all relevant training received by involved staff;
iv. pertinent medical and mental health services/reports involving the victim;
v. possible precipitating factors leading to the suicide; and
vi. recommendations, if any, for changes to policy, training, physical plant, medical or mental health services, and operational procedures; and vii. when appropriate, the review team shall develop a written plan (and timetable) to address areas that require corrective action.

    d. The morbidity and mortality review committee will convene within 30 days of each suicide or serious suicide attempt (e.g., those incidents requiring hospitalization for medical treatment).

    e. The morbidity and mortality review committee shall ensure a corrective action plan is developed after each mortality review.

    f. The morbidity and mortality review committee shall ensure a follow-up mortality review is conducted within 30 days after the pathological examinations are complete.

## IV. JOINT COMPLIANCE OFFICER AND REPORTING REQUIREMENTS

A. As part of the initial selection process or if the JCO position becomes vacant, the Parties agree to jointly select the Joint Compliance Officer ("JCO") within 60 days of the effective date of this Stipulated Settlement. The Parties agree to choose no more than three JCO candidates and will conduct joint interviews of these candidates. The Parties agree to work in good faith during the selection process of the JCO. Should the parties not agree on the selection of the JCO, the Parties will submit the names of the three candidates to the Court, and the Court will select the JCO from the list of candidates. Neither party, nor any employee or agent of either party, shall have any supervisory authority over the JCO's activities, reports, findings, or recommendations. The reasonable cost for the JCO's staff, fees, and expenses shall be borne by the Defendants. The selection of the JCO shall be conducted solely pursuant to the procedures set forth in this Stipulated Settlement and will not be governed by any formal or legal procurement requirements. The JCO may be terminated only for good cause, unrelated to the JCO's findings or recommendations, and only with prior notice to, and approval of, both Parties or by Court order.

B. The JCO shall have relevant experience and education or training in the field of corrections, mental health care, suicide prevention, or medical care. The JCO may also have education, training, or experience in systems of accountability or quality improvement.

C. The JCO shall have full and complete access to the facilities, all facility records, inmate records, staff, and inmates upon notice to the Defendants' Stipulated Settlement Coordinator or his/her designee. The Defendants shall direct all employees to cooperate fully with the JCO.

D. The JCO shall be permitted to initiate and receive ex parte communications with all Parties.

E.   Except as required or authorized by the terms of this Stipulated Settlement
     or the Parties acting together, the JCO shall not: 1) make any public
     statements (at a conference or otherwise); or 2) issue findings with regard to
     any alleged act, error or omission of the Defendants or its agents,
     representatives or employees; or 3) disclose nonpublic information provided to
     the JCO pursuant to this Stipulated Settlement.  Any press statement made
     by the JCO regarding his or her employment herein must first be approved in
     writing by all Parties.  The JCO shall not testify in any other litigation or
     proceeding with regard to any alleged act, error or omission of the County or
     any of its agents, representatives, or employees related to this Stipulated
     Settlement, nor testify in any other matter regarding any matter or subject
     that he or she may have learned about as a result of his or her performance
     under this Stipulated Settlement.  Reports issued by the JCO shall not be
     admissible against the Defendants in any proceeding other than a proceeding
     related to the enforcement of this Stipulated Settlement.  Unless such conflict
     is waived by the Parties, the JCO shall not accept employment or provide
     consulting services that would present a conflict of interest with the JCO's
     responsibilities under this Stipulated Settlement, including being retained
     (on a paid or unpaid basis) by any current or future litigant or claimant, or
     such litigant's or claimant's attorney, in connection with a claim or suit
     against the Defendants, its departments, officers, deputies, agents or
     employees.  The JCO is not a State/County or local agency or an agent
     thereof, and accordingly the records maintained by the JCO shall not be
     deemed public records subject to public inspection.  Neither the JCO nor any
     person or entity hired or otherwise retained by the JCO to assist in
     furthering any provision of this Stipulated Settlement shall be liable for any
     claim, lawsuit or demand arising out of the JCO's performance pursuant to
     this Stipulated Settlement.  This paragraph does not apply to any proceeding
     before a court related to performance of contracts or subcontracts for
     compliance evaluation of this Stipulated Settlement.

F.   The JCO shall file with the Court and provide the Parties with reports
     describing the steps taken by the Defendants to implement this Stipulated
     Settlement and evaluate the extent to which the Defendants are in
     compliance with each substantive provision of the Stipulated Settlement.
     The JCO shall issue such reports every four months, unless both Parties
     otherwise agree in writing.  The reports shall be provided to the Parties in
     draft form at least two weeks prior to its final issuance.  The Parties may
     provide written comments, if necessary, and copy the opposing party. These
     reports shall be written with due regard for the privacy interests of
     individual inmates and staff.  In each report, the JCO shall evaluate the
     status of compliance for each provision of the Stipulated Settlement using the
     following standards:  (1) substantial compliance; (2) partial compliance; and

(3) non-compliance. In order to assess compliance, the JCO shall: review a sufficient number of relevant documents to accurately assess current conditions; interview all relevant staff; and interview a sufficient number of inmates to accurately assess current conditions. The JCO shall be responsible for independently verifying representations from the Defendants regarding progress toward compliance and examining supporting documentation where applicable. Each JCO's report shall describe the steps taken to analyze conditions and assess compliance, including documents reviewed and individuals interviewed, and the factual basis for each of the JCO's findings.

G.    Defendants shall provide the JCO with a reasonable budget sufficient to allow the JCO to carry out the responsibilities described in this Stipulated Settlement. The JCO may hire or consult with additional individuals as necessary to fulfill the duties required by the Stipulated Settlement.

H.    The JCO shall provide the Defendants with technical assistance as requested by the Defendants.

I.    During the term of this Stipulated Settlement, the Defendants shall provide the United States reasonable access upon reasonable notice to confirm the implementation of this Stipulated Settlement as determined by the JCO.

J.    Defendants, and their agents, agree that they shall not retaliate against any person because that person has filed or may file a complaint, provided information or assistance, or participated in any other manner in an investigation or proceeding relating to this Stipulated Settlement.

K.    As part of this Stipulated Settlement, the County will agree to create an additional First Deputy Superintendent position, job group 15, in the Sheriff's Office, Jail Management Division, to facilitate, coordinate, and implement each and every provision of this Stipulated Settlement and any future stipulated settlements entered into between the Defendants and the United States as they may occur in these proceedings who will act as a Stipulated Settlement Coordinator to serve as a point of contact for the United States and the JCO.

L.    Defendants shall not assert physician/patient or psychotherapist/patient privileges with respect to the monitoring of this Stipulated Settlement by the United States and the JCO. The Parties and the JCO will treat all personally identifiable information as confidential.

**VII.  CONSTRUCTION, IMPLEMENTATION, AND TERMINATION**

A.  The Defendants shall implement all reforms necessary to effectuate this Stipulated Settlement.  The implementation of this Stipulated Settlement will begin immediately upon its effective date.

B.  Defendants agree to review and revise policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, address, and implement all provisions of this Stipulated Settlement.  Defendants agree to revise and/or develop as necessary other written documents such as screening tools, logs, handbooks, manuals, and forms, to effectuate the provisions of this Stipulated Settlement.  Defendants agree to send newly-drafted and revised policies and procedures to the United States and the JCO for review and approval as they are promulgated.  Such approval is not to be unreasonably withheld.  In the event that the Defendants believe the United States has unreasonably withheld approval, the Defendants may seek judicial intervention.  As set forth in section III., A. 2., 3., and 4. Defendants will provide initial and refresher training to all facility staff with respect to newly implemented or revised policies and procedures and document employee review and training in policies and procedures.

C.  Except where otherwise specifically provided, Defendants shall complete implementation of all provisions of this Stipulated Settlement within 180 days of its effective date.

D.  The Parties expect that the County will attain substantial compliance with all areas of the Order within two years.  Substantial compliance in this paragraph includes a period of no less than eighteen (18) months of sustained substantial compliance with all provisions of the Stipulated Settlement.  The burden shall be on the Defendants to demonstrate that they have maintained substantial compliance with each of the provisions of the Stipulated Settlement.  If Defendants are in compliance with all of the substantive provisions set out in this Stipulated Settlement earlier than two (2) years from the effective date of the Stipulated Settlement and maintain compliance for at least eighteen (18) months, the parties may then seek to terminate this Stipulated Settlement.  In the event that the United States does not agree that the Defendants are in substantial compliance with all provisions in the Stipulated Settlement and that Defendants have been in substantial compliance for eighteen months, the burden will be on Defendants to demonstrate such compliance.  Noncompliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain substantial compliance.  At the same time, temporary compliance during a period of sustained noncompliance shall not constitute substantial compliance.

E.  If the United States believes that the Defendants have failed to comply with any obligation under this Stipulated Settlement, the United States will, prior to seeking judicial action to enforce the terms of this Stipulated Settlement, give written notice of the failure to Defendants.  The Parties shall engage in good-faith negotiations to attempt to resolve the dispute.  These negotiations will last for a maximum of 30 days from the date of the United States' written notice.  The United States commits to work in good faith with Defendants to avoid enforcement actions.  However, in the case of an emergency posing an immediate threat to the health and safety of inmates, the United States may seek enforcement action without regard to the notice and negotiation requirements herein.

F.  Failure by either party to enforce this entire Stipulated Settlement or any provision thereof with respect to any deadline or any other provision herein shall not be construed as a waiver of its right to enforce other deadlines or provisions of this Stipulated Settlement.

G.  If any unforeseen circumstance occurs that causes a failure to timely carry-out any requirements of this Stipulated Settlement, Defendants shall notify the United States in writing within twenty (20) calendar days after Defendants become aware of the unforeseen circumstance and its impact on Defendants' ability to perform under the Stipulated Settlement.  The notice shall describe the cause of the failure to perform and the measures taken to prevent or minimize the failure.  Defendants shall implement all reasonable measures to avoid or minimize any such failure.

H.  This Stipulated Settlement shall constitute the entire integrated agreement of the Parties.  No prior or contemporaneous communications, oral or written, will be relevant or admissible for purposes of determining the meaning of any provisions herein, in litigation, or in any other proceeding.

I.  The Stipulated Settlement shall be applicable to, and binding upon, all Parties, their officers, deputies, agents, employees, assigns, and their successors in office.  Defendants shall ensure that all current and future relevant County employees understand the terms of this Stipulated Settlement (to the extent necessary to carry out their job duties and responsibilities) and implement the terms of this Stipulated Settlement.

J.  Each party shall bear the cost of its fees and expenses incurred in connection with implementing this Stipulated Settlement.

K.  In the event that any provision of this Stipulated Settlement is declared invalid for any reason by a court of competent jurisdiction, said finding shall not affect the remaining provisions of this Stipulated Settlement.

L.    As part of the Stipulated Settlement, if either party received a request under the Freedom of Information Act or Freedom of Information Law, the parties agree to provide opposing counsel with ten (10) days advance notice prior to responding to any such request.


Dated:      June 18, 2010


## ATTORNEYS FOR PLAINTIFF



s/Thomas E. Perez

**Thomas E. Perez**
Assistant Attorney General
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Ave., NW
Washington, DC  20530

s/William J. Hochul, Jr.

**William J. Hochul, Jr.**
United States Attorney
Western District of New York
138 Delaware Avenue
Buffalo, NY  14202


s/Samuel Bagenstos

**Samuel Bagenstos**
Principal Deputy Assistant Attorney General
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Ave., NW
Washington , DC  20530

s/Judy Preston
**Judy Preston**
Acting Chief, Special Litigation Section
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Ave., NW
Washington, DC 20530

s/Mary E. Fleming
**Mary E. Fleming**
Assistant United States Attorney
Civil Chief
Western District of New York
138 Delaware Avenue
Buffalo, NY 14202

s/Luis E. Saucedo
**Luis E. Saucedo**
Acting Deputy Chief, Special Litigation Section
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Ave., NW
Washington, DC 20530

s/Zazy I. Lopez
**Zazy I. Lopez**
**Aaron Saul Fleisher**
**Alyssa Connell Lareau**
**Charles W. Hart , Jr.**
**Regina Jansen**
Trial Attorneys, Special Litigation Section
U.S. Department of Justice
Civil Rights Division
950 Pennsylvania Ave., NW
Washington, DC 20530

## <u>ATTORNEYS FOR DEFENDANTS</u>

s/Cheryl A. Green
**Cheryl A. Green**
Erie County Attorney
95 Franklin Street
16th Floor
Buffalo, NY  14202

s/Kristin Klein Wheaton
**Kristin Klein Wheaton**
First Assistant County Attorney
95 Franklin Street
Room 1634
Buffalo, NY  14202

## DEFENDANTS

s/Chris Collins
**Chris Collins**
County Executive
County of Erie
95 Franklin Street
Buffalo, NY  14202


s/Anthony Billittier, IV, MD.
**Anthony Billittier, IV, MD.**
County Health Commissioner
County of Erie
95 Franklin Street
Buffalo, NY  14202


s/Timothy B. Howard
**Timothy B. Howard**
Erie County Sheriff
95 Franklin Street
Buffalo, NY  14202


s/Richard T. Donovan
**Richard T. Donovan**
Erie County Undersheriff
95 Franklin Street
Buffalo, NY  14202

s/Robert Koch

**Robert Koch**
Superintendent
Administrative Services Division
Jail Management Division
County of Erie
95 Franklin Street
Buffalo, NY 14202

s/Barbara Leary

**Barbara Leary**
First Deputy Superintendent
Erie County Holding Center
95 Franklin Street
Buffalo, NY 14202

s/Donald Livingston

**Donald Livingston**
First Deputy Superintendent
Erie County Correctional Facility
95 Franklin Street
Buffalo, NY 14202

SO ORDERED: _____

**The Honorable William M. Skretny**

**Date:** _____

APPENDIX A
Screening and Assessment Factors, Triggers, and Thresholds

| Trigger Events Occurring in ECHC and ECCF | Thresholds Reached in ECHC and ECCF |
|---|---|
| **History, Ideation and Observation** | |
| 1. Any suicide attempt<br>2. Any suicide ideation, with or without a plan<br>3. Any aggression to self resulting in major injury | 1. Any suicide<br>2. Any suicide attempt resulting in outside medical treatment<br>3. Two or more suicide attempts within 14 consecutive days<br>4. Four or more suicide attempts within 30 consecutive days<br>5. Four or more episodes of suicidal ideation within 14 consecutive days<br>6. Six or more episodes of suicidal ideation within 30 consecutive days |
| **Detoxification and Use of Illicit Substances** | |
| 1. Any incident of an individual testing positive for illicit substance (street drug) use<br>2. Use of benzodiazepines (continuous for more than 60 days) in an individual with past history of substance use disorder<br>3. Any suicide attempt<br>4. Any suicidal ideation, with or without a plan<br>5. Any aggression to self resulting in major injury | 1. Two or more incidents of illicit use in 7 consecutive days<br>2. Four or more incidents of illicit use in 30 consecutive days |